# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | | |
|---|---|---|
| HIRSCHBACH MOTOR LINES, INC., et al., | | |
| Plaintiffs, | | No. C17-1019-LTS |
| vs. | | **ORDER** |
| SMARTTRUCK UNDERTRAY SYSTEMS, INC., et al., | | |
| Defendants. | | |

---

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 20) to dismiss filed by defendants SmartTruck Undertray Systems, LLC (SmartTruck), Stephen S. Ingham, Jr., Mitchell Greenberg, Steve Wulff and Mike Henderson.  Plaintiffs Hirschbach Motor Lines, Inc. (Hirschbach) and Brad Pinchuk have filed a resistance (Doc. No. 23) and defendants have replied (Doc. No. 28).  I find that oral argument is not necessary.  *See* N.D. Iowa L.R. 7(c).

## II.    PROCEDURAL HISTORY

On August 11, 2017, plaintiffs filed a complaint (Doc. No. 1) asserting thirteen claims for breach of contract, breach of various warranties, fraud and negligent misrepresentation.  Defendants responded on September 21, 2017, by filing a pre-answer motion (Doc. No. 10) to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).  Instead of resisting that motion, plaintiffs filed an amended complaint (Doc. No. 14) on October 12, 2017.  The amended complaint substitutes current defendant Mitchell Greenberg for former defendant Ron Pope and proceeds to assert 26

counts[1] against the defendants. Plaintiffs invoke this court's diversity jurisdiction, asserting no claims that arise under federal law. Defendants filed their present motion to dismiss the amended complaint on November 3, 2017.

### III.    APPLICABLE STANDARDS

Defendants seek dismissal of all of plaintiffs' claims. They argue that the court lacks personal jurisdiction over the individual defendants and that plaintiffs fail to state claims upon which relief can be granted.

### A.    Rule 12(b)(2) – Lack of Personal Jurisdiction

The Federal Rules of Civil Procedure permit a pre-answer motion to dismiss for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). Personal jurisdiction refers to the power of a court to hear and determine a lawsuit involving a defendant by virtue of the defendant's having some contact with the place where a court is located. To properly allege personal jurisdiction, "a plaintiff 'must state sufficient facts in the complaint to support a reasonable inference that the defendant[ ] can be subjected to jurisdiction within the state.'" *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004), *cert. denied*, 543 U.S. 1147 (2005) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)). In resisting a Rule 12(b)(2) motion, the plaintiff has the burden of proving facts supporting such jurisdiction. *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir.), *cert. denied*, 131 S. Ct. 472 (2010). The court may consider the allegations of the complaint along with any affidavits and exhibits submitted

---

[1] Yes, 26 counts. Having carefully reviewed the amended complaint and the parties' submissions, my best guess is that a law clerk or junior associate was tasked with conjuring up the largest possible number of unnecessary and duplicative counts from a relatively-simple dispute. I can think of no proper, non-vexatious reason for this practice.

by the parties. *Id.* The plaintiff's burden, in the absence of an evidentiary hearing, is to make a "minimal" prima facie showing of personal jurisdiction. *K-V Pharm. Co. v. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011). The court "must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in its favor in deciding whether the plaintiff has made the requisite showing." *Id.*

In a diversity case, such as this, personal jurisdiction exists "only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Dever*, 380 F.3d at 1073 (internal quotation marks omitted). Iowa Rule of Civil Procedure 1.306 authorizes the exercise of personal jurisdiction to the full extent allowed by the United States Constitution, meaning the court's inquiry is limited to whether the exercise of personal jurisdiction comports with due process. *Wells Dairy*, 607 F.3d at 518 (citing *Hammond v. Fla. Asset Fin. Corp.*, 695 N.W.2d 1, 5 (Iowa 2005)).

In general, due process requires that a nonresident defendant have at least "certain minimum contacts" with the forum state to support the exercise of personal jurisdiction. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Those contacts must be sufficient that requiring the defendant to litigate in the forum state would not "offend traditional notions of fair play and substantial justice." *Id.* at 316 (internal quotations marks and citation omitted). They "must come about by an action of the defendant purposefully directed toward the forum State." *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 112 (1987) (internal citations omitted).

This "'purposeful availment' requirement ensures that a defendant will not be hauled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts," or due to "the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citations omitted). If the defendant made the deliberate choice to "engage[ ] in significant activities within a State," or to create "'continuing obligations' between himself and residents of the forum," then "it is

presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Id.* at 475-76 (citations omitted). Thus:

> By requiring that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign," the Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit[.]"

*Id.* at 472-73 (1985) (citations omitted).

The Eighth Circuit applies a five-factor test to determine whether a defendant's contacts with the forum state are sufficient to establish personal jurisdiction. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012). Those factors are: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) the forum state's interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties. *Id.* (citing *Precision Const. Co. v. J.A. Slattery Co.*, 765 F.2d 114, 118 (8th Cir. 1985)). The first three factors are considered to be of primary importance. *Precision Const.*, 765 F.2d at 118.

Personal jurisdiction can be either general or specific. General jurisdiction arises when a nonresident maintains "continuous and systematic" contacts with the forum state. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). Under those circumstances, jurisdiction over the nonresident is appropriate even when the claims at issue do not arise out of or relate to its activities in the forum state. *Id.* at 414-15. Specific jurisdiction arises "when the defendant purposely directs its activities at the forum state and the litigation 'result[s] from injuries . . . relating to [the defendant's] activities [in the forum state.]'" *Myers*, 689 F.3d at 912-13 (quoting *Steinbach v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)). Specific jurisdiction "requires a relationship between the forum, the cause of action, and the defendant. *Id.* at 912 (citing *Helicopteros*

*Nacionales*, 466 U.S. at 414).   The third factor of the five-factor test "distinguishes between specific and general jurisdiction." *Id.* at 911 (citing *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010).


**B.      *Rule 12(b)(6) – Failure to State a Claim***

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)], the pleading standard Rule 8 announces but does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [*Twombly*,] 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [our own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g., Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Int'l, Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

## IV.    FACTUAL BACKGROUND

The amended complaint (Doc. No. 14) includes the following allegations:

### A.    *The Parties*

Hirschbach is an Iowa corporation with its principal place of business in Dubuque, Iowa. Doc. No. 14 at ¶ 1. Prior to 2015, Hirschbach was headquartered in East Dubuque, Illinois.[2] Hirschbach is an interstate motor carrier offering semi-tractor transportation services. *Id.* at ¶ 12. Pinchuk is the president and CEO of Hirschbach. *Id.*

SmartTruck is a South Carolina limited liability company with its principal place of business in Greenville, South Carolina. *Id.* at ¶ 3. SmartTruck designs, builds, markets and sells aerodynamic design components to be affixed to semi-tractor trailers in

---

[2] *See* Matthew Patane, *Illinois Trucking Company Moving to Iowa*, Des Moines Register, Jan. 30, 2015, https://www.desmoinesregister.com/story/money/business/2015/01/30/ hirschbach-motor-lines-iowa-headquarters/22583563/. Courts may consider additional evidence on a motion to dismiss under Rule 12(b)(2). *Wells Dairy*, 607 F.3d at 518.

order to reduce the size of high air flow drag-wake, resulting in fuel savings. *Id.* at ¶ 13. Each of the individual defendants are employees and agents of SmartTruck: Ingham is the president, Wulff is the senior vice president of product development, Henderson is the chief scientist and Greenberg was a former president. *Id.* at ¶¶ 4-7. None of the individual defendants are Iowa residents. *Id.* at ¶ 8.

## B.      *The Claims*

In 2011, the parties negotiated for Hirschbach's purchase and installation of 2,000 SmartTruck products for Hirschbach's fleet. *Id.* at ¶ 14. Over the course of various meetings and conversations in 2011, prior to Hirschbach's purchase of SmartTruck products, defendants Ingham, Greenberg, Wulff and Henderson verbally represented that Hirschbach would see improved fuel efficiency of 10% at highway speeds using SmartTruck products. *Id.* at ¶ 16. One of these meetings between Pinchuk, Greenberg and Wulff occurred in Greenville, South Carolina, while another meeting occurred in East Dubuque, Illinois. *Id.* at ¶¶ 15(b), 15(o). Plaintiffs assert that while Pinchuk, Greenberg and Wulff were meeting in East Dubuque, Greenberg and Wulff stayed at hotels and ate in restaurants in Dubuque, Iowa. *Id.* at ¶ 16. One sales meeting was held over lunch at a restaurant in Dubuque, Iowa. *Id.* Greenberg disputes that he ever travelled to Iowa or Illinois to visit Pinchuk. Doc. No. 20-7 at 3. Although plaintiffs allege that Wulff travelled to Iowa on six occasions, Wulff contends that he only travelled to Hirschbach's headquarters once. Doc. No. 20-6 at 3. Plaintiffs do not allege that Ingham or Henderson ever travelled to Iowa.

As part of the negotiation process, SmartTruck offered Hirschbach a discount in exchange for Pinchuk providing a testimonial for SmartTruck to use in its advertising materials. Doc. No. 14 at ¶¶ 25-26. Hirschbach purchased SmartTruck products and installed them on its fleet between 2011 and 2013. *Id.* at ¶ 27. Plaintiffs do not identify

a particular written, integrated agreement governing Hirschbach's purchase of SmartTruck's products. Instead, it contends that an agreement was formed and that Hirschbach then placed written purchase orders "in reliance upon Smart Truck's prior written and oral representations." *Id.* at ¶ 35.

In support of its motion to dismiss, SmartTruck relies on three documents that, it contends, control the scope of its obligations to Hirschbach. SmartTruck claims that Exhibits A and B are "the 2011 and 2013 Product Manuals with the operative limited warranty during the 2011-2017 time period," while Exhibit C is "the SmartTruck limited warranty from 2015 through the present." Doc. No. 20-1 at 4 (referencing Doc. No. 20-2 at 4, Doc. No. 20-3 at 2 and Doc. No. 20-4 at 2). Collectively, I will refer to these documents as the Limited Warranty Documents. Details concerning the contents of the Limited Warranty Documents will be described as necessary below.

In 2014, Pinchuk became aware of independent testing of SmartTruck's products by a Canadian engineering company. *Id.* at ¶ 30. Those results showed that SmartTruck's products were not as effective as claimed. *Id.* Plaintiffs conducted their own testing in 2016 and 2017, which revealed no meaningful difference in fuel efficiency as a result of installing SmartTruck products. *Id.* at 31. Plaintiffs assert that they have been damaged by defendants' failure to improve the fuel efficiency of their semi-trucks to the extent promised. The 26 counts set forth in the amended complaint are based on these representations, and the parties' agreement, as follows:

Count I        Breach of Contract (Hirschbach v. SmartTruck)

Count II       Breach of Written Contract due to Poor Performance (Hirschbach v. SmartTruck)

Count III      Breach of Implied Warranty of Fitness for Particular Purpose (Hirschbach v. SmartTruck)

Count IV       Breach of Express Warranty (Hirschbach v. SmartTruck)

Count V        Fraud (Hirschbach v. Greenberg)

| | |
|---|---|
| Count VI | Fraud (Hirschbach v. Wulff) |
| Count VII | Fraud (Hirschbach v. Henderson) |
| Count VIII | Fraud (Hirschbach v. Ingham) |
| Count IX | Constructive Fraud (Hirschbach v. Greenberg) |
| Count X | Constructive Fraud (Hirschbach v. Wulff) |
| Count XI | Constructive Fraud (Hirschbach v. Henderson) |
| Count XII | Constructive Fraud (Hirschbach v. Ingham) |
| Count XIII | Negligent Misrepresentation (Hirschbach v. SmartTruck) |
| Count XIV | Intentional Misrepresentation (Hirschbach v. SmartTruck) |
| Count XV | Detrimental Reliance/Promissory Estoppel (Hirschbach v. SmartTruck) |
| Count XVI | Unjust Enrichment (Hirschbach v. SmartTruck) |
| Count XVII | Unjust Enrichment (Pinchuk v. SmartTruck) |
| Count XVIII | Fraud (Pinchuk v. Greenberg) |
| Count XIX | Fraud (Pinchuk v. Wulff) |
| Count XX | Fraud (Pinchuk v. Henderson) |
| Count XXI | Fraud (Pinchuk v. Ingham) |
| Count XXII | Constructive Fraud (Pinchuk v. Greenberg) |
| Count XXIII | Constructive Fraud (Pinchuk v. Wulff) |
| Count XXIV | Constructive Fraud (Pinchuk v. Henderson) |
| Count XXV | Constructive Fraud (Pinchuk v. Ingham) |
| Count XXVI | Civil Conspiracy (Hirschbach v. All Defendants) |

*See* Doc. No. 14. Plaintiffs seek monetary damages, punitive damages, attorneys' fees and any other relief deemed equitable.

## V.    DISCUSSION

*A.* *Personal Jurisdiction*

Defendants argue that I lack personal jurisdiction over the individual defendants for two reasons.[3] First, the individuals lack meaningful contacts with Iowa. Second, Iowa's corporate shield doctrine exempts them from personal jurisdiction because they were acting as agents of SmartTruck. Plaintiffs respond that defendants' contacts with Iowa are sufficient to justify the exercise of specific personal jurisdiction over the defendants and that the corporate shield doctrine does not apply. Alternatively, plaintiffs argue that their allegation of a civil conspiracy confers personal jurisdiction over all defendants by virtue of jurisdiction over any defendant under an agency theory.

*1.* *The Corporate Shield Doctrine*

The Iowa Supreme Court describes the corporate shield doctrine as "a due process limitation on the exercise of personal jurisdiction." *State ex rel. Miller v. Grodzinsky*, 571 N.W.2d 1, 3 (Iowa 1997) (*citing Aquadrill, Inc. v. Envt'l Compliance Consulting Srvs., Inc.*, 558 N.W.2d 391, 394-95 (Iowa 1997); *Whalen v. Connelly*, 545 N.W.2d 284, 295-96 (Iowa 1996); *State ex rel. Miller v. Baxter Chrysler Plymouth, Inc.*, 456 N.W.2d 371, 378 (Iowa 1990); *State ex rel. Miller v. Internal Energy Mgmt. Corp.*, 324 N.W.2d 707, 711 (Iowa 1982); *DeCook v. Envt'l Sec. Corp.*, 258 N.W.2d 721, 727-28 (Iowa 1997). Therefore:

> [A] person's mere association with a corporation that causes injury in the forum state is not sufficient in itself to permit the forum to exercise jurisdiction over the agent. *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 [(9th Cir. 1989)].
>
> We have said that the rationale of the doctrine is that exercising jurisdiction over a corporate agent solely on the court's jurisdiction over the corporation itself would "offend traditional notions of fair play and substantial justice."

---

[3] Defendants have not challenged personal jurisdiction over SmartTruck. Failure to challenge personal jurisdiction at the appropriate time constitutes a waiver. Fed. R. Civ. P. 12(h)(1).

*Internal Energy Mgmt.*, 324 N.W.2d at 710 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

*Id.* However,

> A corporate shield does not insulate an agent under all circumstances, the agent is still subject to personal jurisdiction of the court if the agent is a "primary participant[ ] in an alleged wrongdoing intentionally directed at [forum-state] resident[s], and jurisdiction over [him] is proper on that basis." *Calder v. Jones*, 465 U.S. 783, 790 (1984). If this were not so, a person could commit fraud with impunity by simply wrapping up in a foreign corporation. *See Internal Energy Mgmt.*, 324 N.W.2d at 716.

*Id.* at 4. Therefore, "when a corporate agent acts in such a way as to be subject to personal jurisdiction of an Iowa court, irrespective of the court's jurisdiction over the corporation, the corporate shield is inapplicable." *Id.* at 3.

Iowa's approach is consistent with the Supreme Court's in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984). In *Keeton*, the Supreme Court stated:

> [W]e today reject the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity. But jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary. Each defendant's contacts with the forum State must be assessed individually.

*Keeton*, 465 U.S. at 782 n.13 (1984). Further, in *Calder*, the Supreme Court held that a federal district court sitting in California had personal jurisdiction over two Florida residents, who were sued in their individual capacities even though they were employees of the corporate defendant (National Enquirer), on the basis of their own contacts with the state of California. 465 U.S. at 790 ("[The employees] are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction."). To hold that a court lacks personal jurisdiction over an individual *merely* because they also served as an agent of a corporation would allow the doctrine to be used

as a sword, rather than a shield.  *See, e.g., Grodzinsky*, 571 N.W.2d at 3.  Plaintiffs have alleged individual liability against each defendant, based on each defendants' actions.[4]  Therefore, the corporate shield is inapplicable and I will assess the contacts of each defendant with the state of Iowa individually.  *Calder*, 465 U.S. at 790.

## 2.    *Civil Conspiracy*

Plaintiffs also allege in their resistance (Doc. No. 23 at 9) that "civil conspiracy claims can give rise to personal jurisdiction over all co-conspirators when at least one co-conspirator commits a tort in Iowa."  While this may or may not be a correct statement of law,[5] in this case the allegation of civil conspiracy cannot satisfy the requirements of personal jurisdiction if personal jurisdiction exists only over SmartTruck.  Pursuant to the intra-corporate immunity doctrine, a corporation cannot conspire to commit a tort with its agents or employees.[6]  As the Supreme Court recently explained:

---

[4] As a result, this case is distinguishable from *Westlake Invs., L.L.C. v. MLP Mgmt. L.L.C.*, 707 F.Supp.2d 904, 914 (S.D. Iowa 2010).  In *Westlake*, the individual defendant was not involved in the sale at the center of the dispute, was never physically present in Iowa, did not enter into contracts in Iowa, and did not communicate with any Iowa residents.  His lack of involvement with the underlying dispute made the corporate shield doctrine applicable.  *Id.*

[5] Federal courts applying Iowa law have disagreed on this issue.  *Compare Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1094-95 (N.D. Iowa 2005) (predicting Iowa law would find personal jurisdiction on the basis of a civil conspiracy) *with Brown v. Kerkhoff*, 504 F. Supp. 2d 464, 514-17 (S.D. Iowa 2007) (disagreeing that Iowa would recognize a per se rule of personal jurisdiction over co-conspirators, while acknowledging that co-conspiracy is relevant to minimum contacts analysis). Given my resolution of the minimum contacts of each defendant, however, I need not resolve the dispute over when a conspiracy *alone* is sufficient to establish jurisdiction because, as I will discuss further, there is no jurisdictionally relevant conspiracy alleged here.

[6] Iowa courts have not specifically considered whether the intra-corporate immunity doctrine applies to civil conspiracy claims.  *See, e.g., All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 995 (S.D. Iowa 2012) (finding no "Iowa cases that stand for the proposition that a corporation cannot conspire to commit a common law tort with its . . . employees" (citing *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 884 (N.D. Iowa 1999))).  However,

The rule is derived from the nature of the conspiracy prohibition. Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two persons of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to the principal. And it then follows that there has not been an agreement between two or more separate people.

*Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017) (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769-71 (1984)); *see also Johnson v. Vilsack*, 833 F.3d 948, 958-59 (8th Cir. 2016); *Kelly v. City of Omaha*, 813 F.3d 1070, 1078 (8th Cir. 2016).

In this case, because the corporation is not a co-conspirator, jurisdiction over SmartTruck is irrelevant for the purpose of determining jurisdiction over the individual defendants. The individuals certainly could have conspired with each other, but personal jurisdiction depends on each individual's minimum contacts with the forum state. A co-conspirator's contacts with the forum state may fill the gap to establish personal jurisdiction in some cases. *See, e.g., Brown*, 504 F. Supp. 2d at 517 ("Clearly, nonresident co-conspirator defendants cannot hunker in distant states and claim the lack of a physical presence in the forum defeats personal jurisdiction . . . co-conspirators must take care not to be agents of each other, lest both be haled into a forum where either resides"). However, a bare pleading of civil conspiracy does not substitute for minimum contacts.

### 3.    *Minimum Contacts with the Forum State*

As a starting point, "random or attenuated contacts with the forum state do not satisfy the minimum contacts test." *Ostrem v. Prideco Secure Loan Fund, LP*, 841 N.W.2d 882, 890 (Iowa 2014). The unilateral activities of a plaintiff or some other entity

---

given the widespread acceptance of the doctrine and its limited application here to agents within the same corporation, I find that Iowa would apply the intra-corporate immunity doctrine.

cannot satisfy the minimum contacts requirement. *Id.* at 892 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). A contract between an individual and an out-of-state party alone does not establish sufficient contacts to permit the exercise of specific jurisdiction, *Burger King*, 471 U.S. at 478, nor does extended contact by phone or email, *e.g., Porter v. Berall,* 293 F.3d 1073, 1076 (8th Cir. 2002). Rather, a court must evaluate the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine "whether the defendant purposefully established minimum contacts within" a state. *Burger King*, 471 U.S. at 479. It is the defendants' contacts *with the state*, and not with the plaintiffs, that is central. *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (the question is whether the defendant formed any "jurisdictionally relevant" contacts with the forum state).

### a.     *Ingham*

Ingham's contacts with the state of Iowa are few in quantity and low in quality. Plaintiffs do not allege that Ingham ever visited Iowa. Ingham states that he never travelled to Iowa in connection with business between SmartTruck and Hirschbach. In fact, plaintiffs do not allege that Ingham had any in-person meetings with Pinchuk, whether in Iowa or at SmartTruck's South Carolina headquarters. Doc. No. 14 at ¶¶ 12-33, 107-18, 156-66, 228-34, 259-66. Although physical presence in a state is not dispositive, it is a relevant factor to be considered. *Walden*, 134 S. Ct. at 1121-22.

Ingham does concede that he communicated with plaintiffs to negotiate the contract at issue. Doc. No. 20-5 at ¶ 13. However, neither the contract itself nor knowledge that he was entering into an agreement with an Iowa corporation is sufficient to establish purposeful availment of the privilege of conducting activities within the forum state. *Burger King*, 471 U.S. at 478-80; *see also Wiese v. Legend Air Susps., Inc.*, 985 F. Supp. 2d 964, 970 (S.D. Iowa 2012) ("Assuming arguendo those communications did

occur while [plaintiff] was in Iowa, they still fail to establish that the exercise of personal jurisdiction comports with due process.") (citing *Viasys., Inc. v. EBM-Papst St. Georgen GmbH & Co.*, 646 F.3d 589, 594 (8th Cir. 2011) ("scattered e-mails, phone calls, and a wire transfer of money" to the forum state did "not constitute a deliberate and substantial connection with the state" that would authorize specific jurisdiction); *Porter*, 293 F.3d at 1076 ("Contact by phone or mail is insufficient to justify exercise of personal jurisdiction under the due process clause."); *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 656 (8th Cir. 1982) ("[T]he use of arteries of interstate mail, telephone, railway and banking facilities is insufficient, standing alone, to satisfy due process."))). Simply put, mere communication with an Iowa business is an insufficient contact to establish the minimum contacts necessary to establish specific jurisdiction in Iowa.

While Iowa has an interest in providing a forum for resident plaintiffs, this factor, standing alone, fails to establish that the exercise of personal jurisdiction comports with due process. *See Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 524 (8th Cir. 1996) ("[Iowa's] interest in providing its residents with a forum cannot make up for the absence of minimum contacts."). Neither does the fact that Iowa may be a convenient forum for plaintiffs overcome the deficiencies of the first three elements. In view of the totality of the circumstances, the exercise of personal jurisdiction over Ingham in Iowa is not consistent with due process.

### b. *Henderson*

From the complaint and from Henderson's affidavit, it is clear that Henderson had the same contacts with Iowa as Ingham. Accordingly, the same conclusion applies to Henderson.

### c. *Wulff*

The plaintiffs allege that Wulff travelled to Hirschbach's headquarters in Iowa and that these contacts are sufficient to establish personal jurisdiction over Wulff. Plaintiffs allege that Wulff visited Hirschbach's headquarters on six occasions. Doc. No. 14 at ¶ 17. Wulff states in his affidavit that he only did so once. Doc. No. 20-6 at ¶ 12. When personal jurisdiction is disputed, the plaintiff bears the burden of proving facts supporting personal jurisdiction and may not rely on the pleadings alone. *See Wells Dairy*, 607 F.3d at 518. Because plaintiffs have not responded to Wulff's affidavit with evidence, it stands undisputed.

There *is* a genuine dispute over whether Wulff actually travelled to Iowa at all. In 2011, Hirschbach's headquarters were still located in East Dubuque, Illinois. Plaintiffs allege that the distinction between the cities of East Dubuque, Illinois, and Dubuque, Iowa, is irrelevant because "East Dubuque, Illinois, is small and there are no hotels and restaurants in East Dubuque, Illinois.[7] Defendants necessarily had to stay in and eat in Dubuque, Iowa, when visiting Hirschbach or Pinchuk."[8] Doc. No. 23 at 9.

Regardless of where Wulff ate or stayed, the relevant inquiry is whether there are sufficient contacts with the forum state to satisfy the requirements of due process. The fact that Wulff may have ate or stayed in Iowa while negotiating with Hirschbach at its Illinois headquarters on one occasion is hardly sufficient to justify personal jurisdiction.

---

[7] This statement is plainly untrue. A simple internet search reveals a Comfort Inn in East Dubuque, Illinois, and East Dubuque is home to many restaurants, including Timmerman's Supper Club. I may take judicial notice of matters of public record, pursuant to Rule 201 of the Federal Rules of Evidence. *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Regardless, as is discussed more fully above, these facts are largely irrelevant to the jurisdictional analysis.

[8] Wulff does not respond to the allegation that he necessarily stayed in Dubuque, Iowa. *See* Doc. No. 20-6. For the purpose of the present motion, I will assume that he did.

*See, e.g., Austad Co. v. Pennie & Edmonds*, 823 F.2d 223, 226-27 (8th Cir. 1987) (although attorney-client relationship existed between South Dakota business and New York law firm, business brought action based on law firm's conduct as its attorney, and two of the firm's employees traveled to South Dakota to review and inspect documents, there was no personal jurisdiction over law firm); *Brown*, 504 F. Supp. 2d at 512 (business contacts between nonresident defendants and Iowa were insufficient to support specific personal jurisdiction even though plaintiffs alleged that each defendant made 4-12 visits to Iowa, and each additionally authored material directed into Iowa through the mail or internet). A hotel stay is precisely the sort of "random" or "attenuated" contact that is disallowed as a basis for personal jurisdiction. Thus, exercise of personal jurisdiction over Wulff in Iowa is not consistent with due process.

### d. Greenberg

Like Ingham, Greenberg has very few direct contacts with the state of Iowa. Plaintiffs allege that Greenberg was in Iowa on at least one occasion. Doc. No. 14 at ¶¶ 15(n), 15(o), 16. Greenberg disputes that claim in an affidavit. Doc. No. 20-7 at ¶ 10 ("To the best of my knowledge, I did not visit any Hirschbach facility in 2011 and specifically did not attend the trip with Steve Wulff described in the Amended Complaint."). Again, plaintiffs have not responded to Greenberg's affidavit with evidence, so it stands undisputed. There is no basis for exercising personal jurisdiction over Greenberg.

### 4. Conclusion - Personal Jurisdiction

Because none of the individual defendants are subject to personal jurisdiction in Iowa, all four must be dismissed as defendants. This disposes of the 16 counts (Counts V through XII and Counts XVIII through XXV) that are brought only against the

individual defendants. I must now consider SmartTruck's contention that the ten surviving counts fail to state a claim upon which relief may be granted.

## B.     *Failure to State a Claim*

SmartTruck argues that plaintiffs' various claims fail because (1) the written terms of the various agreements between the parties do not establish a breach of contract or of any warranty, (2) plaintiffs' allegations do not establish either negligent or intentional misrepresentation as a matter of law,[9] and (3) plaintiffs' are not permitted to recover under quasi-contract theories (detrimental reliance and unjust enrichment) in the presence of a written contract. Plaintiffs respond that they have plead sufficient facts that, when accepted as true, allow the court to infer that SmartTruck knowingly made false promises to plaintiffs, resulting in damages. As this is a diversity action, I must apply the substantive law, including choice-of-law rules, of the forum state. *Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851-52 (8th Cir. 2014). The parties are proceeding under the assumption that Iowa law applies. As such, I will do the same.

---

[9] With regard to the fraud claims, SmartTruck also argues that plaintiffs have engaged in "impermissible shotgun style" pleading "in an unsuccessful attempt to state" their claims with insufficient particularity. Doc. No. 20-1 at 6, 21-22 (citing *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 554, 556 (8th Cir. 2006); *Sagez v. Glob. Agr. Invs., LLC*, No. 11-CV-3059-DEO, 2015 WL 1647921 at *4 (N.D. Iowa Apr. 14, 2015)). "The typical shotgun complaint contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Sagez*, 2015 WL 1647921at *4 (citing *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 1998). Although plaintiffs do in fact incorporate prior allegations by reference throughout their complaint, perhaps meeting the technical definition for a shotgun pleading, in this case the effect is not so confusing that the complaint "shifts onto the defendant the burden of identifying the plaintiff's genuine claims and determining which of those claims might have legal support." *Id.* (quoting *Gurman v. Metro. Hous. & Redev. Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011). Thus, while plaintiffs' pleading style is hardly to be encouraged, each claim is sufficiently distinguishable that I am able to determine which have merit. *Id.*

***1.   Count I-II (Breach of Contract, Hirschbach v. SmartTruck and Breach
        of Contract due to Poor Performance, Hirschbach v. SmartTruck)***

Hirschbach claims that, from 2011 to 2017, it entered into an agreement with SmartTruck and placed several written purchase orders for SmartTruck's products in reliance on SmartTruck's prior written and oral representations as to the products' effectiveness.  Doc. No. 14 at ¶¶ 34-36.  "By the terms of the contract agreement," Hirschbach was to realize a fuel savings of 10%.  *Id.* at ¶¶ 36-39.  Hirschbach claims that it did not achieve any fuel savings after installation of the products, thus demonstrating that SmartTruck breached the agreement.

In response, SmartTruck relies on the Limited Warranty Documents and contends that they constitute an integrated written agreement that forecloses Hirschbach's breach of contract claims.[10]  Doc. No. 20-1 at 10-11.  Hirschbach argues that those documents do not constitute the entire agreement between the parties and that extrinsic evidence is permitted to interpret the scope of the warranties, specifically the promise that the products "SHALL BE: . . . (III) CAPABLE OF . . . FULFILLING ITS INTENDED PURPOSE."  Doc. No. 23 at 10-11 (citing Doc. No. 20-2 at 7) (original capitalization). Regarding that language, SmartTruck responds by pointing to other language in the installation manuals stating that "the SmartTruck UnderTray System increases aerodynamic efficiency by redirecting air from around the vehicle to fill in the low-

---

[10] On a motion to dismiss pursuant to Rule 12(b)(6), the court ordinarily cannot consider matters outside of the pleadings, unless the court converts the Rule 12(b)(6) motion into a motion for summary judgment pursuant to Rule 56.  *See* Fed. R. Civ. P. 12(b)(6); *see also Buck v. F.D.I.C.*, 75 F.3d 1285, 1288 n.3 (8th Cir. 1996). However, where, as here, the plaintiffs' claims are based on the interpretation of the documents underlying the contract dispute, I may consider those documents embraced by the pleading without converting the motion into a summary judgment motion.  *See, e.g., Jenisio v. Ozark Airlines, Inc.*, 187 F.3d 970, 972 n.3 (8th Cir. 1999) (citing *Silver v. H & R Block, Inc.*, 105 F.3d 394, 397 (8th Cir. 1997)).

pressure wake behind the trailer." *See* Doc. No. 20-2 at 3. SmartTruck contends that its products *have* fulfilled their purpose, albeit perhaps not to the level expected by the Hirschbach. Hirschbach, of course, point to numerous other instances in which SmartTruck allegedly promised a fuel efficiency increase of 10%.

Under Iowa law:

> [T]o establish a claim for a breach of contract, the [plaintiff] must show:
>
>> (1) The existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citing *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110-11 (Iowa 2013); *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). The parties do not dispute the existence of a contract, or that Hirschbach performed. Further, Hirschbach plausibly claims that SmartTruck made the alleged representations concerning fuel efficiency and that it was damaged by its failure to achieve meaningful fuel savings. At issue is whether Hirschbach has plead sufficient facts giving rise to a plausible claim that the representations regarding fuel savings were part of the contract, giving rise to a cause of action for breach of contract.

At the outset, I note that the Limited Warranty Documents cannot, by themselves, encompass a complete integrated agreement, in spite of their integration clauses. This is because those documents do not include any of the terms that must accompany a contract for the sale of goods. *See, e.g.,* Iowa Code § 554.2201 (listing requirements of a contract for sale of goods); *see also Lenvin Leasing Co. v. Dickey Co.*, 380 N.W.2d 748, 750 (Iowa Ct. App. 1985) (the presence of an integration clause is one factor in determining whether an agreement is fully integrated; however, an integration clause is not sufficient evidence of the parties' intent to create a complete and exclusive statement of the terms

of the agreement). There is no evidence of how or when the Limited Warranty Documents were provided to Hirschbach, or whether they were ever made part of a contract for sale of goods. As noted above, SmartTruck admits that the first two documents (Docs. No. 20-2 and 20-3) were contained in its product manuals, which presumably would have been delivered after the sale. Doc. No. 20-1 at 4. The third document (Doc. No. 20-4) is provided with no information as to how, or if, it was ever provided to Hirschbach. At the pleadings stage, it is absurd to argue, and impossible to find, that the Limited Warranty Documents constitute the entirety of the agreement between the parties.

It *is* possible, as SmartTruck argues, that the Limited Warranty Documents may foreclose Hirschbach's claims when read in context with the entire agreement. However, taking the Hirschbach's allegations as true, Hirschbach has plausibly stated a claim for breach of contract. Two of the three attached warranties state that SmartTruck's product will be "capable of . . . fulfilling its intended purpose."[11] Doc. No. 20-2 at 7; Doc. No. 20-3 at 4. The phrase "intended purpose" is not clearly defined. SmartTruck points to a descriptive statement contained elsewhere in the installation manual that may be

---

[11] All three warranties additionally state: "No person or entity is authorized by seller to make and seller shall not be bound by any statement or representation as to the performance of seller's products other than as contained herein." Doc. No. 20-2 at 7, 20-3 at 4; 20-4 at 2. SmartTruck could have disclaimed its own statements regarding the performance of its products. *See Miller v. Elliott Aviation Aircraft Sales, Inc.*, No. 4:13-cv-00161, 2014 WL 12601040 (S.D. Iowa Mar. 31, 2014). In *Miller*, the court held that the seller disclaimed its own (clearly false) representations as to the condition of an airplane because the contract at issue was clearly integrated, the airplane was sold "as is," the purchaser had and took the opportunity to inspect the airplane before purchase and the contract expressly disclaimed any and all verbal representations as to the condition of the airplane. *Id.* at *6. The court had the entire contract before it, rather than three isolated warranty documents. Further, the disclaimers in *Miller* were far more encompassing than those at issue here. At this stage, I cannot say that the disclaimers in SmartTruck's Limited Warranty Documents encompassed SmartTruck's own alleged statements about the effectiveness of its aerodynamic component parts.

relevant, but this statement is one of several about the products' intended purpose that could be controlling. The pleadings and the documents before me are susceptible to an inference that the intended purpose of SmartTruck's products was to improve fuel efficiency by 10%. Thus, it is plausible that a level of improved fuel efficiency became a term of the contract, and that SmartTruck is in breach. Count I will not be dismissed.

Count II, however, appears to be entirely duplicative of Count I. Hirschbach's claim under Count I is that the products did not perform as promised. Hirschbach's claim under Count II (Breach of Contract due to Poor Performance) states that the products performed poorly. It is not clear from the pleadings, or from Hirschbach's arguments, how Count II is materially different in any way from Count I. Under Rule 12(f), the Court "may strike from a pleading . . . any redundant [or] immaterial . . . matter." Fed. R. Civ. P. 12(f). "[D]uplicative remedies do not necessarily make claims 'redundant' within the meaning of Rule 12(f), if the claims otherwise require proof of different elements; however, a claim that merely recasts the same elements under the guise of a different theory may be stricken as redundant pursuant to Rule 12(f)." *Sioux Biochem., Inc. v. Cargill, Inc.*, 410 F. Supp. 2d 785, 804 (N.D. Iowa 2005) (citing *Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 23 F. Supp. 2d 974, 1009 (N.D. Iowa 1998)). Hirschbach argues in its resistance that the elements for Count II are the same as Count I, and its theory of breach is based on the same contract and warranty terms. Thus, I will strike Count II as redundant.

### 2. *Counts III & IV (Breach of Implied Warranty of Fitness for Particular Purpose and Breach of Express Warranty, Hirschbach v. SmartTruck)*

In Count III, Hirschbach states that it purchased SmartTruck's products for the purpose of achieving a 10% increase in fuel efficiency and that SmartTruck was aware of this purpose. Doc. No. 14 at ¶¶ 47-49. Hirschbach relied on SmartTruck's representations that the products would achieve this purpose. *Id.* at ¶ 50. By selling

products that fail to accomplish this purpose, SmartTruck has breached the implied warranty of fitness for a particular purpose. *Id.*

In Count IV, Hirschbach claims that SmartTruck's representations that its products would lead to increased fuel efficiency was an express warranty that SmartTruck has breached. Doc. No. 14 at ¶¶ 53-61. SmartTruck argues, as it does above, that the implied warranty of fitness for a particular purpose and any related express warranties regarding the performance of its products were waived or limited by the Limited Warranty Documents. Docs. No. 20-2 at 7, 20-3 at 4, 20-4 at 2. SmartTruck also argues that the damages limitations contained in those documents preclude Hirschbach's claims. Hirschbach responds that SmartTruck's disclaimers and limitations fail to comply with the requirements of Iowa law.

### a. Creation of a warranty

Under Iowa law, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 554.2316 an implied warranty that the goods shall be fit for such purpose." Iowa Code § 554.2315. By contrast, an express warranty can be created by any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain. Iowa Code § 554.2313; *see also Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 825 (N.D. Iowa 1997).

Here, the pleadings adequately allege that SmartTruck knew Hirschbach was buying its products for the purpose of improving fuel efficiency and that Hirschbach relied on SmartTruck's various statements regarding the products' effectiveness. Under Iowa law, this is sufficient to establish an implied warranty of fitness for a particular purpose. *See, e.g., Nationwide Agribus. Ins. Co. v. SMA Elevator Const., Inc.*, 816 F.

Supp. 2d 631, 671-72 (N.D. Iowa 2011) (to find an implied warranty of fitness for a particular purpose the contract must respond to a particular need of the consumer (citing *Semler v. Knowling*, 325 N.W.2d 395, 399 (Iowa 1982))); *SmithCo Mfg., Inc. v. Haldex Brake Prods. Corp.*, 708 F. Supp. 2d 816, 821-22 (N.D. Iowa 2010) (a request for the "best product" to deal with a "specific problem" is sufficient to define a buyer's "particular purpose" within the meaning of § 554.2315 (citing *Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 637 (Iowa 1988))); *see also* Iowa Code § 554.2315. Additionally, Hirschbach has alleged that SmartTruck made several statements related to the products' performance that could have become part of the bargain. *See, e.g., Ltd. Flying Club, Inc. v. Wood*, 632 F.2d 51, 56-57 (8th Cir. 1980) (logbook that set forth the repair and inspection history of airplane formed part of the basis of the bargain as a description of the goods).

### b.     *Effect of the Warranty Exclusions*

Because Hirschbach has plausibly pleaded both an express warranty and an implied warranty of fitness for a particular purpose, I must consider whether the Limited Warranty Documents so clearly limited or excluded these warranties as to render Hirschbach's claims implausible. The implied warranty of fitness for a particular purpose may be excluded only by a conspicuous writing. Iowa Code § 554.2316(2). Iowa courts have defined conspicuous, with reference to a term, to mean that it is "written, displayed or presented [so] that a reasonable person against which it is to operate ought to have noticed it." *NuTech Seed, LLC v. Roup*, 212 F. Supp. 3d 783, 792-93 (S.D. Iowa 2015) (citing Iowa Code § 554.1201(2)(j)); *R.J. Meyers Co. v. Reinke Mfg. Co., Inc.*, 885 N.W.2d 429, 438 (Iowa Ct. App. 2016) (same).

Iowa courts look to statute to determine whether terms are conspicuous:

Conspicuous terms include the following: (1) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or

color to the surrounding text of the same or lesser size; and (2) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to that language.

*Id.* (citing Iowa Code § 554.1201(j)). By contrast, express waivers can be limited by any words or conduct tending to have that effect, provided that the limitation "shall be construed wherever reasonable as consistent with [the warranty]; but subject to the provisions of this Article on parole or extrinsic evidence[12] (section 554.2202) negation or limitation is inoperative to the extent that such construction is unreasonable." Iowa Code § 554.2316(1); *see also Ltd. Flying Club*, 632 F.2d at 56-57. Thus, Iowa law allows for an express warranty that is nonetheless limited in some respects by the language of the contract. However, if the warranty and the limitation cannot reasonably be construed together, the warranty prevails over the limitation and the contract must be read as a consistent and cohesive whole. *Select Pork, Inc. v. Babcock Swine, Inc.*, 640 F.2d 147, 149 (8th Cir. 1981); *Ltd. Flying Club*, 632 F.2d at 56-57; *Cannon v. Bodensteiner Implement Co.*, 903 N.W.2d 322, 328 (Iowa 2017).

The Limited Warranty Documents are in writing, and two of the three limitations (Doc. No. 20-3 and 20-4) are certainly "conspicuous" under Iowa law, with the text purporting to waive the implied warranty set apart in a combination of bolded font and capitalized letters, and in a shaded box.[13] However, as I have previously discussed, it is

---

[12] SmartTruck argues that because the Limited Warranty Documents contain an integration clause, I am barred from considering extrinsic evidence to interpret them. This is not a correct statement of Iowa law. As discussed above, (a) the integration clause is evidence of integration but not conclusive of the fact and (b) it is not clear at this stage of the case when, or if, the Limited Warranty Documents were provided to Hirschbach.

[13] The parties dispute whether the limitation contained in the first attached warranty (Doc. No. 20-2) is conspicuous under Iowa law. However, given my finding that the attached warranties

impossible to determine at this time whether these documents constitute the entire agreement between the parties. Iowa's requirement that a limitation or waiver of a warranty be read consistently with the entire agreement make it possible that in its proper context, the Limited Warranty Documents do not waive the implied warranty of fitness for a particular purpose. Indeed, in two of the three Limited Warranty Documents, SmartTruck warrants that the aerodynamic component parts will be "[c]apable of . . . fulfilling its intended purpose." This appears to be inconsistent with a blanket waiver of an implied warranty of fitness for a particular purchase. Thus, Count III plausibly states a claim for breach of the implied warranty of fitness for a particular purpose and Count IV plausibly states a claim for breach of express warranty.

### c. Effect of the Damages Limitations

Finally, I must consider SmartTruck's argument that the damages limitations in the Limited Warranty Documents bar Hirschbach's claims. The first document states:

> If a defect or failure occurs within the aforementioned warranty period, buyer shall promptly notify seller in writing and, upon confirmation by an authorized seller representative of such defect or failure, seller shall either replace the defective UnderTray unit at no cost to the buyer or refund the purchase price for said unit paid by buyer. The refundable purchase price shall pro-rate for time during the second and third years of the warranty period.
>
> ***
>
> Where the law implies a warranty, seller expressly limits its liability under any such warranty to the repair or replacement (at seller's choice) of any product supplied under this agreement.
>
> ***

---

do not constitute the entire agreement between the parties, I need not decide this issue to resolve the present motion to dismiss.

> Under no circumstances shall either party (or its officers, employees or agents) be liable to the other for any special, incidental or consequential loss or damage sustained by the other, including without limitation lost profits or costs, in connection with this agreement or the UnderTray, whether sought in tort or contract.

Doc. No. 20-2 at 7 (emphasis omitted). The other two documents contain nearly identical limitations on damages. Doc. No. 20-3 at 4; Doc. No. 20-4 at 2.

SmartTruck's argument regarding the damages limitations fails for two reasons. First, as has already been explained, at this stage it is impossible to conclude that the Limited Warranty Documents constitute the entire contract between the parties. Second, damages limitations are not per se enforceable under Iowa law. Iowa law allows parties to negotiate a limited remedy for breach of warranty under certain circumstances. *See* Iowa Code § 554.2719(1)(a). However, the enforceability of a replace and repair limitation depends on the essential purpose of the contract:

> Where repair or replacement can give the buyer what is bargained for, a limitation of remedies does not fail of its essential purpose." [*Midwest Hatchery & Poultry Farms, Inc. v. Doorenbos Poultry, Inc.*, 783 N.W.2d 56, 63 (Iowa Ct. App. 2010)]. Conversely, "[w]here the seller is given a reasonable chance to correct defects and the equipment still fails to function properly, the limited remedy of repair or replacement of defective parts fails of its essential purpose." *John Deere Co. v. Hand*, 319 N.W.2d 434, 437 (Neb. 1982). In other words, where the limited remedy fails, then the buyer may avail itself of other remedies set forth in the UCC, including damages.

*R.J. Meyers Co.*, 885 N.W.2d at 437-38. Here, because Hirschbach plausibly claims that it bargained for products that would improve its fuel efficiency by 10%, the damages limitation fails if repair or replacement would not give it the benefit of the bargain. Thus, at the pleadings stage the damages limitation does not foreclose Hirschbach's damages claims. Counts III and IV will not be dismissed.

### 3. Count XIII (Negligent Misrepresentation, Hirschbach v. SmartTruck)

In Count XIII, Hirschbach claims that SmartTruck negligently made incorrect statements regarding the effectiveness of SmartTruck's products. Doc. No. 14 at ¶ 168. Hirschbach states that it was reasonable for it to believe that SmartTruck held itself out as a seller of information in addition to holding itself out as a seller of products, based on its various connections with BMI Corporation (BMI), a company that sells testing and information related to aerodynamics, and with Henderson Industries, LLC, a company that designs and develops aerodynamic solutions. [14]    *Id.* at ¶ 169-70. As a result, Hirschbach contends, SmartTruck had a duty to provide accurate information. *Id.* at ¶ 172. Hirschbach states that it would not have purchased the products in the absence of the misrepresentations. *Id.* at ¶ 173, 175. SmartTruck responds that it was not in the business of selling or supplying information, and that Hirschbach's alleged confusion on that point was not justified. Doc. No. 20-1 at 18-19. As a result, SmartTruck contends that Hirschbach's claim fails as a matter of law. *Id.* at 19.

Iowa follows the Restatement (Second) of Torts approach to negligent misrepresentation. Thus:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable

---

[14] BMI, according to the complaint, is listed at the same address as SmartTruck. BMI was founded by Henderson, the Chief Scientist at SmartTruck at the time of the events giving rise to the present complaint. Doc. No. 14 at ¶ 6. Further, BMI describes SmartTruck as a "project" of BMI, and there is a link to SmartTruck's website on BMI's website. Doc. No. 14 at ¶ 169. Henderson Industries is also listed at the same address and Henderson, Greenberg and Wulff are all executives of Henderson Industries. *Id.* at ¶ 170. However, based on Hirschbach's allegations, Henderson Industries is not in the business of selling information. The connections to BMI are of limited relevance as well. BMI is not named as a defendant and the connections alleged do not advance Hirschbach's theory that SmartTruck was in the business of selling or providing information.

reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Van Sickle Const. Co. v. Wachovia Commercial Mortg., Inc.*, 783 N.W.2d 684, 690 (Iowa 2005) (citing Restatement (Second) of Torts § 552 cmt. a); *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (same). Iowa has limited the tort of negligent misrepresentation to "those who are 'in the business of supplying information to others.'" *Id.* (citing *Meier v. Alta-Laval, Inc.*, 454 N.W.2d 576, 582 (Iowa 1990). The purpose of this limitation is to:

> [P]romote[] fairness by ensuring that those liable are only those who supply information in an advisory capacity and are "manifestly aware" of how the information will be used and "intend[] to supply it for that purpose." The restriction also ensures that those liable are "in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect."

*Id.* (citing *Van Sickle Const.*, 783 N.W.2d at 691 (internal citations omitted)).

Whether a duty between two persons exists is always a question of law for the courts. *Fry v. Mount*, 554 N.W.2d 263, 265 (Iowa 1996) (citing *Hoffnagle v. McDonald's Corp.*, 522 N.W.2d 808, 811 (Iowa 1994). To determine whether a defendant is "in the business of supplying information:"

> We distinguish between relationships that are arm's-length and adversarial and those that are advisory. *Sain* [*v. Cedar Rapids Cmty. Sch. Dist.*, 626 N.W.2d 115, 124-25 (Iowa 2001)]. We also consider whether the person providing the information "is manifestly aware of the use that the information will be put, and intends to supply it for that purpose." *Id.* at 125. We consider whether the defendant gave the information to the plaintiff "gratuitously or incidental to a different service." *Id.* We have also found it appropriate to consider the role the defendant was playing when the alleged misrepresentation occurred. *See Meier* [*v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 581 (Iowa 1990)] (determining whether a cause of action would lie where the defendant supplied information in his "role as a retail merchant").

> We have found accountants, appraisers, school guidance counselors and investment brokers all fall within this class of potential defendants. *Sain*, 626 N.W.2d at 126; *Larsen v. United Fed. Savs. & Loan Ass'n*, 300 N.W.2d 281. 287-88 (Iowa 1981); *Ryan* [*v. Kanne*, 170 N.W.2d 395, 403 (Iowa 1969)]; *McCracken v. Edward D. Jones Co.*, 445 N.W.2d 375, 376, 382 (Iowa Ct. App. 1989). However, we have refused to allow a suit for negligent misrepresentation where the defendant was a retailer in the business of selling and servicing merchandise, a seller who made misrepresentations pursuant to the sale of a business, a bank officer negotiating a loan guarantee with a bank customer, or an employer negotiating with an employee for employment. *Fry*, 554 N.W.2d at 266; *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller*, 514 N.W.2d 905, 906, 910 (Iowa 1994); *Meier*, 454 N.W.2d at 581.

*Pitt*, 818 N.W.2d at 111-112. Those in the business of selling products are almost never "in the business of supplying information," because "any information provided during the course of business is incidental." *Fry*, 554 N.W.2d at 266. Put another way, Iowa courts "seek to distinguish the sale of information as a product from information given incidentally as part of another transaction." *Dinsdale Const., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 650 (Iowa 2016) (citing *Pitts*, 818 N.W.2d at 112).

Hirschbach does not allege that SmartTruck was in the business of selling information as a product. Instead, it alleges that it was confused as a result of SmartTruck's advertising material, representations, and association with a business that did, in fact, supply information as a product. In support of its position that SmartTruck owed a duty based on these factors, Hirschbach cites *Nationwide Agribus. v. Structural Restoration, Inc.*, 705 F. Supp. 2d 1070 (S.D. Iowa 2010), for the proposition that some companies sell information in order to bolster their sale of products. *Nationwide* is distinguishable from the present case and does not supply the duty that is missing here. In *Nationwide*, the defendant provided free grain silo inspections, which it in turn used as a marketing tool to sell grain silos. *Id.* at 1078-79. The court concluded that the defendant's pecuniary interest in making the inspections gave rise to a duty to use

30

reasonable care in making those inspections, even though the inspection was free and the plaintiff did not make a purchase. *Id.*

Hirschbach's focus on the pecuniary benefit to SmartTruck in providing advertising material about its products misses the point of *Nationwide*: the defendant sought to avoid liability because the inspection was gratuitous, not because the defendant was a retailer of goods. By providing *inspections*, the *Nationwide* defendant was in the business of supplying information. The *Nationwide* analysis focused on a different element of the test giving rise to a duty than the element at issue here.

This case is similar to the typical arms-length, adversarial interaction between a seller and a purchaser of goods, with the seller providing information about the goods. As set forth above, such a relationship may give rise to contract and warranty claims if the goods do not conform to the information provided. However, the seller in such a situation is not in the business of supplying information. Hirschbach has not plead a plausible claim for negligent misrepresentation under Iowa law. SmartTruck's motion will be granted as to Count XIII.

### 4. Count XIV (Intentional Misrepresentation, Hirschbach v. SmartTruck)

In Count XIV, Hirschbach claims that SmartTruck[15] knew that the representations it made regarding the performance of its products were false and that it intentionally made false statements for the purpose of inducing Hirschbach's reliance. Doc. No. 14 at ¶¶ 176-79. The majority of the false statements that are the subject of the complaint are alleged to have occurred in 2011. Doc. No. 14 at ¶¶ 15(a), (g), (n) and 16. However,

---

[15] For purposes of the present motion, I will assume that the individual defendants were acting as agents of SmartTruck, and that SmartTruck was thus bound by their actions. *See, e.g., Gabelmann v. NFO, Inc.*, 571 N.W.2d 476, 481 (Iowa 1997) ("[A] corporation . . . can only act through its agents and employees . . . . A basic element of agency law is that whatever an agent does . . . binds the agent's principal." (citation omitted)).

SmartTruck—through Ingham—is alleged to have made false statements on at least one occasion in 2014, after he was confronted with the test results that Hirschbach alleges contradict SmartTruck's representations. *Id.* at ¶ 32. Hirschbach contends that it relied on SmartTruck's representations and that it would not have bought SmartTruck's products in the absence of the representations. *Id.* at ¶¶ 180-81. SmartTruck primarily argues that Hirschbach has failed to plead scienter, i.e., that SmartTruck *knew* its statements regarding fuel efficiency were false prior to 2014. Doc. No. 20-1 at 14.

To establish intentional misrepresentation or fraud, Hirschbach must prove "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damages." *Van Sickle Const.*, 783 N.W.2d at 687 (citing *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004). Claims for fraud are subject to the heightened pleading requirement of Rule 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This requires Hirschbach to plead "the who, what, when, where, and how" of the fraud. *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (citing *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986, 995 (8th Cir. 2007)).

A representation is material "if it substantially affects the interest of the party alleged to have been defrauded," or "if it is likely to induce a reasonable person to act." *Dier v. Peters*, 815 N.W.2d 1, 8 (Iowa 2012) (citing *Kanzmeier v. McCoppin*, 398 N.W.2d 826, 830 (Iowa 1987). However, mere puffery or statements of opinion—even when incorrect—are not actionable. Only a statement of fact may be considered material.[16] *Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 827-828 (N.D. Iowa 1997) (citing *Hoeft v. Wis. Educ. Assoc. Ins. Trust*, 470 N.W.2d 336 (Iowa 1991)).

---

[16] SmartTruck further contends that "broken promises" are not actionable (implying that their broken promises regarding fuel efficiency are not actionable). However, the cases SmartTruck

32

The scienter element may be established by either the defendant's knowledge that a representation was false or the defendant's reckless disregard for the truth. *Van Sickle Const.*, 783 N.W.2d at 688 (citing *Garrison v. First Realty, Ltd.*, 481 N.W.2d 335, 338 (Iowa 1992)). However, "a false statement innocently but mistakenly made will not establish intent to defraud unless the statement was recklessly asserted." *Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 28 (Iowa 1997).

Finally, reliance must be justifiable. *Union Cnty. v. Piper Jaffray & Co.*, 788 F. Supp. 2d 902, 918 (S.D. Iowa 2011) ("The justifiable-reliance standard does not mean that a plaintiff may blindly rely on a representation. Instead, the standard requires plaintiffs to utilize their abilities to observe the obvious, and the entire context of the transaction is to be considered to determine if the justifiable-reliance element is met." (citing *Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726, 737 (Iowa 2009))). To determine whether a plaintiff justifiably relied on a false representation, Iowa courts consider:

> (1) the sophistication and expertise of the plaintiff . . . in financial matters; (2) the existence of long-standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff . . . initiated the transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Union Cnty.*, 788 F. Supp. 2d at 918 (quoting *Spreitzer* at 779 N.W.2d at 737; *Davidson v. Wilson*, 973 F.2d 1391, 1400 (8th Cir. 1992). Put another way, "the issue is whether

---

relies on hold only that a broken promise does not prove intent to defraud. At the pleading stage, more than a broken promise is needed to meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Brown v. N. Central F.S., Inc.*, 987 F. Supp. 1150, 1158 (N.D. Iowa 1997) (discussing the "general rule that broken promises are not actionable as fraud . . . unless if when made the speaker had an existing intention not to perform" (citations omitted)).

the plaintiffs, in view of their own information and intelligence, had a right to rely on the representations." *Id.* (citing *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980)).

Taking the facts alleged in the light most favorable to the non-moving party, Hirschbach has plausibly alleged that SmartTruck made material, false representations that its products would improve the fuel efficiency of Hirschbach's fleet by 10%. Hirschbach has also plausibly alleged that it reasonably relied on the representations, resulting in injury and damages. The alleged representations go to the very purpose of the agreement between SmartTruck and Hirschbach. Given the specificity of the representations and the lengthy negotiations between the parties, it was not unreasonable for Hirschbach to rely on the representations, at least prior to 2014.

A more difficult question is whether Hirschbach has plausibly pleaded the required scienter element. Hirschbach has plead several explanations as to how SmartTruck knew its representations were false when made. I must consider whether any of these explanations plausibly allege that SmartTruck had the required state of mind. Hirschbach contends that Greenberg, Henderson, Wulff and Ingham each attempted to discredit test results that contradicted SmartTruck's own testing when confronted with those results in 2014. Doc. No. 14 at ¶¶ 30, 32, 111. For each of the above individuals, Hirschbach also alleges that their "conduct" before and after the sale of SmartTruck's products revealed their "true intentions" to dupe Hirschbach. *Id.* at ¶¶ 64, 77, 94, 109. Similarly, Hirschbach alleges that each individual's "true and fraudulent intentions" were revealed in various meetings with Hirschbach before and after the sale of SmartTruck's products, without stating how these intentions were revealed. *Id.* at ¶¶ 69, 86, 101, 112.

Finally, for each individual, Hirschbach alleges the following:

Greenberg knew of the falsity of the claims made as he claims SmartTruck did its own testing, which purports results wildly different from reality. It is reasonable to believe that Smart Truck's own testing would have revealed the lack of fuel efficiency from the aerodynamic component parts or that

34

Greenberg knew of the unreliability and variables in the testing that could have produced false results.

*Id.* at ¶ 70.

Wulff was involved with and had direct knowledge of the testing that was performed by Smart Truck in developing its claimed fuel cost savings. Wulff knew that the testing done by SmartTruck was not accurate or in line with the real performance of Smart Truck's aerodynamic component parts. Wulff was also aware of the conflicting test results from independent testing facilities, and still continued to make the false claims regarding performance and fuel cost savings. It is reasonable to believe that SmartTruck's own testing would have revealed the lack of fuel efficiency from the aerodynamic component parts or that Wulff knew of the unreliability and variables in the testing that could have produced false results.

*Id.* at ¶ 87.

Henderson was one of the key persons involved with developing Smart Truck's aerodynamic component parts and developing the testing, Henderson knew that the advertised results of the testing were not in line with the reality of the negligible fuel cost savings that would be achieved from use of the SmartTruck aerodynamic component parts. It is reasonable to believe that Smart Truck's own testing would have revealed the lack of fuel efficiency from the aerodynamic component parts or that Henderson knew of the unreliability and variables in the testing that could have produced false results.

*Id.* at ¶ 102.

Ingham knew of the falsity of the claims made as he claims Smart Truck did its own testing, which purports results wildly different from reality. It is reasonable to believe that Smart Truck's own testing would have revealed the lack of fuel efficiency from the aerodynamic component parts or that Ingham knew of the unreliability and variables in the testing that could have produced false results.

*Id.* at ¶ 113. Hirschbach does not actually allege that SmartTruck's testing was unreliable. Nor does Hirschbach explain how it came to the conclusion that SmartTruck's testing would have revealed the "true" results of an approximate 1.5% increase in fuel efficiency. Rather, in the face of conflicting tests, and without alleging that SmartTruck

knew of the conflicting tests prior to 2014, Hirschbach claims it is reasonable to infer that SmartTruck knew its test results were wrong, or lied about the test results.

Fatal to this argument is the allegation that Pinchuk had a great deal of access to SmartTruck's testing system and was able to inspect the products before its purchase. SmartTruck even did testing on Hirschbach's own fleet of semi-trailers, at Hirschbach's facility. Doc. No. 14 at ¶¶ 15(n)-(o). Hirschbach makes no allegations that SmartTruck lied about or concealed its testing procedures and Hirschbach had every opportunity to inquire further or look for contradictory information before it made its purchase. The unsupported allegation that SmartTruck should have known its tests results were false or misleading does not establish that SmartTruck either knew or recklessly disregarded the falsity of its tests. The further allegations that SmartTruck defended its testing and discredited the contradictory tests just as easily support an inference that it believed its testing methods were more accurate than those of its competitors. The fact that SmartTruck made a promise, and that promise did not come true, is insufficient to support an inference of scienter. *Brown*, 987 F. Supp. at 1158. Hirschbach has failed to state a claim of intentional misrepresentation under Iowa law. Count XIV will be dismissed.[17]

### 5. *Counts XV-XVII (Detrimental Reliance, Hirschbach v. SmartTruck; Unjust Enrichment, Hirschbach v. SmartTruck; and Unjust Enrichment, Pinchuk v. SmartTruck)*

Hirschbach and Pinchuk assert three claims under a quasi-contract theory. In Count XV, Hirschbach alleges that SmartTruck made clear promises regarding the fuel costs savings Hirschbach would receive with the expectation that such promises would induce action by Hirschbach to its detriment. Doc. No. 14 at ¶¶ 184-85. Hirschbach

---

[17] Of course, if discovery discloses evidence bolstering a claim that SmartTruck made false representations with the requisite scienter, Hirschbach may seek leave to amend the complaint accordingly. At this stage of the case, however, the factual allegations set forth in the amended complaint are insufficient.

contends it would be unjust to permit SmartTruck to avoid liability for these promises. *Id.* at ¶ 187. In Count XVI, Hirschbach argues that SmartTruck has been unjustly enriched by Hirschbach's payment to SmartTruck, based on false representations. *Id.* at ¶¶ 189-95. Finally, in Count XVII Pinchuk alleges that his endorsement of SmartTruck and other benefits bestowed upon SmartTruck on the basis of SmartTruck's false promises have unjustly enriched SmartTruck. *Id.* at ¶¶ 197-206.

SmartTruck responds that the various warranties and limitations in the Limited Warranty Documents foreclose SmartTruck's quasi-contract claims as a matter of law. Doc. No. 20-1 at 20. Further, SmartTruck contends that it has "established that there is in fact an enforceable contract between the parties," such that Hirschbach "may no longer recover under the theory of promissory estoppel." *Id.* at 19 (quoting *Farm & Ranch Servs., Ltd. V. LT Farm & Ranch, LLC*, 779 F. Supp. 2d 949, 966 (S.D. Iowa 2011); *Union Pac. R.R. Co. v. Cedar Rapids & Iowa City Ry. Co.*, 477 F. Supp. 2d 980, 1001-02 (N.D. Iowa 2007). Hirschbach responds that its quasi-contract claims are not foreclosed by its express contract claims, because "a party may state as many separate claims or defenses as it has, regardless of consistency." Doc. No. 23 at 25 (citing Fed. R. Civ. P. Rule 8(d)(3)). Further, Hirschbach contends that Iowa law allows a party to recover on a quasi-contract theory for contract terms not covered by an express contract in certain situations. *Id.* (citing *Legg v. W. Bank*, 873 N.W.2d 763, 771 (Iowa 2016)).

Both parties are correct in their analysis of Iowa law. The theory of detrimental reliance, or promissory estoppel, allows a party to be held liable for its promise in spite of the lack of consideration typically found in a contract. *See Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999) (citing Samuel Williston, *Williston on Contracts* § 8.4, at 41 (1992)). To prove detrimental reliance, Hirschbach must establish: "(1) a clear and definite oral agreement; (2) proof that plaintiff acted to his detriment in reliance thereon; and (3) a finding that the equities entitle the plaintiff to this relief." *Id.*

(citing *Johnson v. Pattison*, 158 N.W.2d 790, 795 (Iowa 1971); *Nat'l Bank v. Moeller*, 434 N.W.2d 887, 889 (Iowa 1989).

Unjust enrichment is a related equitable remedy that serves to imply a contract when one party has conferred a benefit on the other. *See Iowa Waste Sys., Inc. v. Buchanan Cnty.*, 617 N.W.2d 23, 29-30 (Iowa 2000). The elements for unjust enrichment are: "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and impoverishment; (4) absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law." *Irons v. Cmty. State Bank*, 461 N.W.2d 849, 855 (Iowa Ct. App. 1990).

Quasi-contract theories are foreclosed by an express, integrated contract except in limited circumstances:

> A person who pleads an express contract ordinarily cannot also recover under an implied contract. *Scott v. Grinnell Mut. Reins. Co.*, 653 N.W.2d 556, 561 (Iowa 2002). "An express contract and an implied contract cannot coexist with respect to the same subject matter, and the former supersedes the latter." *Chariton Feed & Grain v. Harder*, 369 N.W.2d 777, 791 (Iowa 1985). "Although we have held there may be a contract implied in law on a point not covered by an express contract, there can be no such implied contract on a point fully covered by an express contract and in direct conflict therewith." *Smith v. Stowell*, 125 N.W.2d 795, 800 (Iowa 1964).

*Legg*, 873 N.W.2d at 771-72 (discussing plaintiffs' claim for unjust enrichment where there was an express contract). Thus, although Hirschbach and Pinchuk are allowed to plead inconsistent theories of recovery at this stage of the case, Fed. R. Civ. P. 8(d)(3), the claims for breach of express contract (Counts I-IV) and breach of quasi contract (Counts XV-XVII) are not necessarily inconsistent. As noted above, it is impossible at this stage of the case to conclude that an express, integrated contract was formed. Thus, the quasi-contract claims are not foreclosed as a matter of law. Hirschbach and Pinchuk have plausibly plead facts demonstrating that SmartTruck made promises intended to

induce reliance and that the promises were broken, resulting in an unjust benefit conferred upon SmartTruck. Counts XV through XVII will not be dismissed.

### 6. Count XXVI (Civil Conspiracy to Commit Fraud, Hirschbach v. All Defendants)

In Count XXVI, Hirschbach alleges that all of the named defendants agreed to act together to commit various torts against it. Doc. No. 14 at ¶¶ 268-274. I have already found that the individual defendants must be dismissed from this action due to lack of personal jurisdiction. However, I must address Hirschbach's civil conspiracy claim against SmartTruck.

Hirschbach fails to state a claim for civil conspiracy for two reasons. First, as discussed above, a corporation cannot conspire with its own agents. Hirschbach has not alleged that the corporation conspired with anyone other than Greenberg, Wulff, Henderson and Ingham. Each is a corporate officer of SmartTruck and was acting as an agent of SmartTruck during the relevant events. Second, a claim for civil conspiracy cannot survive in the absence of an underlying tort claim. *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 172 (Iowa 2002) ("Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action. . . ." (citations omitted, modification supplied)). Here, I have found that Hirschbach has failed to state a plausible fraud claim. As such, any claim for civil conspiracy to commit fraud necessarily fails. Count XXVI will be dismissed.

## VI. CONCLUSION

For the reasons discussed above, defendants' motion to dismiss (Doc. No. 20) is **granted in part** and **denied in part**. The motion is **granted** as to the following claims:

1. As to Count II: **granted**. Hirschbach's claim for breach of written contract due to poor performance is struck pursuant to Fed. R. Civ. P. 12(f).

2.   As to Counts V, VI, VII, VIII, IX, X, XI and XII: **granted**.  Hirschbach's claims for fraud and constructive fraud against the individual defendants are dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

3.   As to Counts XIII and XIV: **granted**.  Hirschbach's claims for negligent misrepresentation and fraud against SmartTruck are dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

4.   As to Counts XVIII, XIX, XX, XXI, XXII, XXIII, XXIV and XXV: **granted**.  Pinchuk's claims for fraud and constructive fraud against the individual defendants are dismissed for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

5.   As to Count XXVI: **granted**.

   a.   Hirschbach's claim for civil conspiracy against the individual defendants is dismissed for lack of personal jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(2).

   b.   Hirschbach's claim for civil conspiracy against SmartTruck is dismissed for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6).

The motion is **denied** with respect to Counts I, III, IV, XV, XVI and XVII.  This case will proceed with regard to those six counts.


**IT IS SO ORDERED.**

**DATED** this 3rd day of January, 2018.

_____
Leonard T. Strand, Chief Judge

40